IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal No. 19-CR-10075-MLW |
| | ) | |
| RUDOLPH "RUDY" MEREDITH, | ) | |
| | ) | |
| Defendant | ) | |

The government respectfully submits the following response to the Court's Order of March 14, 2019. Dkt. 16.

## Proposed Instructions Concerning Applicable Law

The two-count Information in this case charges the defendant, Rudolph "Rudy" Meredith, with conspiracy to commit wire fraud and honest services wire fraud (Count One), in violation of Title 18, United States Code, Section 1349, and honest services wire fraud (Count Two), in violation of Title 18, United States Code, Sections 1343 and 1346. Set forth below are instructions concerning the applicable law for wire fraud, honest services wire fraud, and conspiracy to commit those crimes.

## Wire Fraud

Section 1343, the wire fraud statute, provides as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

The Information alleges that the defendant conspired to commit wire fraud by participating in a fraudulent scheme to defraud Yale University of property: that is, admission to Yale. The elements of that offense are set forth below.[1]

The first element of wire fraud is that there was a scheme, substantially as charged in the Information, to defraud or to obtain money or property by means of materially false or fraudulent pretenses.

A "scheme" or "artifice" includes any plan, pattern or course of action. The term "defraud" means to deceive another in order to obtain money or property by misrepresenting or concealing a material fact. A scheme to defraud is ordinarily accompanied by a desire or purpose to bring about some gain or benefit to oneself or some other person or by a desire or purpose to cause some loss to some person.

The term "false or fraudulent pretenses" means any false statements or assertions that were either known to be untrue when made or were made with reckless indifference to their truth. The terms includes actual, direct false statements as well as half-truths, the knowing concealment of facts, or the knowing omission of material facts. Deceitful statements or half-truths or the concealment or omission of material facts, and the expression of an opinion not honestly entertained may also constitute false or fraudulent statements or pretenses under the statute. The deception need not be premised upon spoken or written words alone. It may also take the form of silence in a case in which one has a duty to speak.

---

[1] Adapted from First Circuit Pattern Crim. Jury Instr. § 4.13; Judge D. Brock Hornby's 2015 *Revisions To Pattern Criminal Jury Instructions for the District Courts of the First Circuit*, D. Me. Internet Site Ed., No. 4.18.1343, http://www.med.uscourts.gov/pdf/crpjilinks.pdf (updated 7/17/15 by Chief District Judge Nancy Torrensen); *Neder v. United States*, 527 U.S. 1, 25 (1999) ("[M]ateriality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes.").

The government is not required to prove that the defendant originated the scheme to defraud. A scheme to defraud need not be shown by direct evidence, but may be established by all of the circumstances and facts in the case. Furthermore, it is not necessary for the government to prove that the defendant actually realized any gain from the scheme or that the intended victim actually suffered any loss, so long as the goal of the scheme was to deprive the victim of money or property.

Here, the term "property" refers to a place in the incoming class at Yale University, and Yale's right to control the composition of that class.[2]

The second element of wire fraud is that the scheme involved the misrepresentation or concealment of a material fact or matter.

A "material fact or matter" is one that has a natural tendency to influence or is capable of influencing the decision of the decision-maker to whom it was addressed. The government need not prove that anyone actually relied on a statement.

The third element of wire fraud is that the defendant knowingly and willfully participated in the scheme with the intent to defraud.

---

[2] *See, e.g., United States v. Frost*, 125 F.3d 346 (6th Cir. 1997) (holding that the University of Tennessee had a property interest in its unissued diplomas under the mail fraud statute and noting: "The number of degrees which a university may award is finite, and the decision to award a degree is in part a business decision. Awarding degrees to inept students, or to students who have not earned them, will decrease the value of degrees in general. More specifically, it will hurt the reputation of the school and thereby impair its ability to attract other students willing to pay tuition, as well as its ability to raise money. The University of Tennessee therefore has a property right in its unissued degrees."); *see also United States v. Gatto*, 295 F. Supp. 3d 336 (S.D.N.Y. Feb. 28, 2018) (noting, in the context of the college admissions process, that the concealment of the bribe payments deprived the University of Louisville and the University of Miami of their right to control the use of their assets); *cf., e.g., Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979) (noting that "the right to exclude others is one of the most essential sticks in the bundle of rights that are commonly characterized as property").

The defendant acted "knowingly" if he was conscious and aware of his actions, realized what he was doing or what was happening around him, and did not act because of ignorance, mistake or accident. An act is willful if done voluntarily and intentionally, and with the specific intent to do something the law forbids (here, defraud others), or with specific intent to fail to do something the law requires to be done; that is to say, with bad purpose either to disobey or to disregard the law.

The fourth element of wire fraud is that interstate wire communications were used in furtherance of the scheme—that is, either the defendant caused an interstate wire communication to be used, or that it was reasonably foreseeable to him that for the purpose of executing the scheme or in furtherance of the scheme, an interstate wire communication would be used.

## Honest Services Wire Fraud

The Information also alleges that the defendant conspired to commit honest services wire fraud by participating in scheme to defraud Yale of its right to his honest and faithful services through bribes and kickbacks. Section 1346 provides that, as used in Section 1343, "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."

The second, third and fourth elements of honest services wire fraud are the same as those for wire fraud set forth above.

The first element, however, is different. It requires that the defendant knowingly participated in a scheme to defraud Yale of its right to the honest services of its employee—here, the defendant himself—through bribes or kickbacks. Notably, it may be fraudulent if a person in a fiduciary relationship owing a duty of loyalty to another, such as an employee-

4

employer relationship, fails to disclose information he knows should be disclosed and fails to disclose it with the intent to defraud another.[3]

An employee owes a fiduciary duty to his employer. This fiduciary duty is a duty to act only for the benefit of the employer, and not for the employee's own enrichment.[4] When an employee devises or participates in a bribery or kickback scheme, that employee violates his employer's right to his honest services. This is because the employee outwardly purports to be working solely for the employer, but instead has received benefits from a third-party. The employer is defrauded because the employer is not receiving what it expects and is entitled to, namely, the employee's honest services.

The breach of the fiduciary duty must be by participation in a bribery or kickback scheme—which involves the actual, intended or solicited exchange of a thing of value in exchange for, as applicable here, Meredith's agreement to use his position at Yale to designate unqualified applicants as soccer recruits—in other words, a *quid pro quo* (a Latin phrase meaning "this for that" or "these for those").[5] Bribery and kickbacks also include offers and

---

[3] *See Skilling v. United States*, 561 U.S. 358, 401 (2010) ("When one tampers with (the employer-employee) relationship for the purpose of causing the employee to breach his duty (to his employer), he in effect is defrauding the employer of a lawful right. The actual deception that is practised is in the continued representation of the employee to the employer that he is honest and loyal to the employer's interests.") (further citation and internal quotation marks omitted); *United States v. Martin*, 228 F.3d 1, 16 (1st Cir. 2000).

[4] *See, e.g., United States v. Rybicki*, 354 F.3d 124, 141-42; n.17 (2d Cir. 2003) (in private sector, statute applies to an "officer or employee of a private entity (or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers)").

[5] *See United States v. Sun-Diamond Growers*, 526 U.S. 398, 404-05 (1999) (interpreting § 201(b): "In other words, for bribery there must be a *quid pro quo*-a specific intent to give or receive something of value in exchange for an official act." (emphasis in original)); *United States v. Kemp*, 500 F.3d 257, 281 (3d Cir. 2007) ("The Supreme Court has explained, in interpreting the federal bribery and gratuity statute, 18 U.S.C. § 201, that bribery requires a quid pro quo. . .")

5

solicitations of things of value in exchange for action. That is, bribery and kickbacks can include the offer or agreement to provide a thing of value to an employee in exchange for, in this case, that employee's use of his position to designate unqualified applicants as soccer recruits.

The employee and the individual or individuals providing the things of value need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods.[6] Rather, the intent to exchange may be established by circumstantial evidence, based upon the defendant's words, conduct, acts, and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn from them. Bribery and kickbacks require the intent to effect an exchange of something of value for, in this case, Meredith's use of his position at Yale to designate certain applicants as soccer recruits, thereby significantly bolstering their admissions prospects, but each payment need not be correlated with the provision of an official act.[7] The requirement that there be

---

(quoting *Sun-Diamond*, 526 U.S. at 404); *United States v. Whitfield*, 590 F.3d 325, 353 (5th Cir. 2009) (requiring a specific intent to give or receive a thing of value "in exchange for an official act to be performed sometime in the future") (further citations and internal quotation marks omitted); *United States v. Ganim*, 510 F.3d 134, 148-49 (2d Cir. 2007) (Sotomayor, J.) ("an intent to effect an exchange") .

[6] *United States v. Urciuoli*, 613 F.3d 11, 15, n. 3 (1st Cir. 2010) *citing United States v. Kincaid-Chauncey*, 556 F.3d 923, 943-47 (9th Cir. 2009) (*quid pro quo* bribe need not be evidenced by any express agreement or statements of intent); *United States v. Kemp*, 500 F.3d 257, 282-85 (3d Cir. 2007) (same).

[7] *Skilling*, 561 U.S. at 413 (citing *Kemp*, 500 F.3d at 281-86 (bribery theory of honest-services fraud satisfied by "stream of benefits" in exchange for some official action, without need to show specific benefit for specific action: "payments may be made with the intent to retain the official's services on an 'as needed' basis, so that whenever the opportunity presents itself the official will take specific action on the payor's behalf."); *Whitfield*, 590 F.3d at 352-53 (specified act need not be identified at time of payment: "The law only requires that the Government prove the 'specific intent to give or receive something of value *in exchange* for an official act' to be performed sometime in the future.") (emphasis in original); *Ganim*, 510 F. 3d

payment of a thing of value in return for an official act is satisfied so long as the evidence shows a "course of conduct" of things of value flowing to an employee in exchange for acts by the employee on an "as needed" basis. In other words, the intended exchange in bribery can be "this for these" or "these for these," not just "this for that." Thus, all that must be shown is that things of value were provided to the employee with the intent of securing his services in return.[8]

Finally, "anything of value" includes things possessing intrinsic value, whether tangible or intangible, that the person giving or offering or the person soliciting or receiving considers to be worth something.[9] This includes a sum of money, shares of stock, tickets, favorable treatment, or a job offer. It also includes things of value given not to the defendant himself but to a family member or third parties for the benefit of the defendant and at the defendant's knowing direction.

## Conspiracy

---

at 147-49 (no need to link each specific bribe with a single official act: "If the public official knows that he or she is expected as a result of the payment to exercise particular kinds of influence or decision making to the benefit of the payor, and, at the time the payment is accepted, intended to do so as specific opportunities arose, that is bribery.")

[8] *United States v. Urcuioli*, 613 F.3d 11, 14-15; n. 3 (1st Cir. 2010).

[9] *United States v. Margiotta*, 688 F.2d 108, 114 (2nd Cir. 1982) (affirming conviction in honest services mail fraud scheme in which defendant directed "payment of kickbacks to insurance brokers and others" designated by defendant); *United States v. Kemp*, 500 F.3d 257, 285 (3rd Cir. 2007) (As a "legal matter" court found that "providing a loan to a public official (or his friends or family)" not otherwise available on same terms "may constitute a bribe" in honest services prosecution.); *United States v. Brown*, 540 F.2d 364, 369 (8th Cir. 1976) (affirming conviction in honest services fraud scheme in which building commission/defendant had contractor pay rent on his girlfriend's apartment); *cf.* 18 U.S.C. § 201(b)(2) (proscribing public official from accepting anything of value for himself or "for any other person").

The crime of conspiracy, pursuant to Section 1349, has two elements. First, the government must prove that the agreement specified in the Information, and not some other agreement, existed between at least two people to commit wire fraud or honest services wire fraud. Second, the government must prove that the defendant willfully joined in that agreement.

The government must prove two types of intent before a defendant can be said to have willfully joined the conspiracy: an intent to agree and an intent, whether reasonable or not, that the underlying crime or crimes be committed. The government does not have to prove that the conspiracy succeeded or was achieved. Likewise, the government does not have to prove that the defendant agreed to commit both objects of the conspiracy, only that he agreed to commit at least one of them.[10]

## Statement of Facts

Set forth below is a statement of the factual basis for the proposed guilty plea.

Yale University is a private university located in the District of Connecticut. During the period of the charged conspiracy, the defendant, Rudolph "Rudy" Meredith, was employed by Yale as its head coach of women's soccer. As a result of his employment, Meredith owed a fiduciary duty to Yale. Instead of acting in Yale's best interests, however, Meredith agreed to accept bribes from two individuals in exchange for using his authority to designate certain

---

[10] Adapted from *Griffin v. United States*, 502 U.S. 46 (1991); *United States v. Mitchell*, 85 F.3d 800, 809-11 (1st Cir. 1996) (affirming trial court jury instruction that jury only had to find guilt unanimously as to one of the two objects of conspiracy); *United States v. Capozzi*, 486 F.3d 711, 718 (1st Cir. 2007) ("district court properly instructed the jury that guilt must be based upon proof of an agreement to commit any one of the three objects of the conspiracy and that the jury had to be unanimous as to which if any of the three objects were proved beyond a reasonable doubt")

applicants to Yale as recruited athletes without regard for their athletic ability, thereby facilitating their admission to the university. Effectively, Meredith sold the recruiting spots allocated to him by Yale, and his authority to allocate those spots, for his own personal benefit. Meredith concealed his actions, and the bribe payments he received, from Yale.

Yale is a highly selective university. For the class matriculating in 2018, Yale accepted just 6.3 percent of its 35,000 applicants. The SAT test scores of Yale students typically range between 720 and 770 for reading and writing, and between 740 and 790 for math.

As these statistics suggest, spots in the Yale incoming class are limited, coveted, and difficult to obtain. Those spots are the property of the university, and the university controls their distribution through its Admissions Office. The quality of Yale's undergraduate students is a key asset of the university and the decision whether to admit an applicant to Yale is a key business decision of the university. Indeed, the number of students offered admission to Yale each year is largely fixed. Accordingly, the use of fraud to obtain admission to the university deprives Yale of its ability to control the distribution of its assets, and results in other applicants not obtaining admission to Yale. Moreover, top-quality students attract top-quality faculty who, in turn, bring in research dollars and prestige. Finally, as is true of many universities, the cost of tuition at Yale does not cover the cost of attendance, with the result that there is a significant out-of-pocket cost to Yale for every student it admits.

Yale competes in most sports, including women's soccer, at the Division 1 level, which is the highest level of intercollegiate athletics sanctioned by the National Collegiate Athletic Association ("NCAA"). Yale allots a specific number of admissions spots to each sports team, including soccer, for the purpose of recruiting student-athletes. Recruited athletes who meet certain academic criteria have significantly improved prospects of admission relative to other

9

applicants, including applicants with similar grades and test scores. Accordingly, by virtue of his position at Yale, Meredith had the ability to allocate a limited number of admissions spots to student-athletes, and thereby to significantly improve their prospects of admission to the university.

As set forth below, in or about and between April 2015 and April 2018, Meredith agreed to accept large bribe payments from an individual named Rick Singer—a resident of California who owned the Edge College & Career Network, LLC, also known as "The Key," a for-profit college counseling and preparation business, and who also served as chief executive officer of the Key Worldwide Foundation ("KWF"), a non-profit corporation that operated as a purported charity—in exchange for recruiting Singer's clients to the Yale women's soccer team without regard for their athletic ability. The money, totaling approximately $860,000, was paid to Meredith personally by KWF.

As one example of how Meredith's conspiratorial agreement with Singer worked, in early November 2017, Singer was introduced to the family of an individual ("Yale Applicant 1") through a Los Angeles-based financial advisor. By this point, Yale's application deadline for early admission had passed. Nonetheless, Singer forwarded Yale Applicant 1's resume and personal statement to Meredith via e-mail communications in interstate commerce. Neither the resume nor the statement contained any reference to soccer.

Singer then fabricated a soccer "profile" that, among other things, falsely described Yale Applicant 1 as the co-captain of a prominent club soccer team, and provided this to Meredith via e-mail. Meredith knew that the information Singer provided to him was false. Indeed, Yale Applicant 1 had never played competitive soccer. Nonetheless, Meredith designated Yale Applicant 1 as a soccer recruit, using the falsified profile to justify that designation, and

persuaded Yale's Admissions Office to allow Yale Applicant 1 to apply early even though the deadline had passed, thereby facilitating Yale Applicant 1's admission to Yale as an early admission candidate. On January 1, 2018, shortly after Yale Applicant 1's admission to Yale, Singer mailed Meredith a check in the amount of $400,000. Singer, in turn, was paid $1.2 million by the family of Yale Applicant 1.

Meredith likewise accepted bribes directly from Individual A, the parent of another Yale applicant ("Yale Applicant 2"), in exchange for which he agreed to designate Yale Applicant 2 as a recruit to the Yale women's soccer team without regard for her athletic ability.

In the late summer of 2017, Meredith entered into a separate agreement with Individual A, a resident of Los Angeles whose daughter, Yale Applicant 2, was a junior in high school. Pursuant to that agreement, Individual A agreed to pay Meredith a sum of money in the mid-six figures in exchange for Meredith's designation of Yale Applicant 2 as a soccer recruit.

In March 2018, Individual A learned during the execution of a Court-authorized search warrant of his home that he was the target of a securities fraud investigation by the U.S. Attorney's Office for the District of Massachusetts and the Federal Bureau of Investigation. Thereafter, Individual A traveled to Boston to meet with the government for a proffer interview. Individual A advised investigators, among other things, about the bribery agreement with Meredith.[11] At the direction of law enforcement agents, Individual A engaged in a series of

---

[11] Individual A's statements to investigators were made pursuant to a standard proffer agreement. Individual A subsequently agreed to plead guilty to an Information charging him with securities fraud and conspiracy to commit securities fraud, in violation, respectively, of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 18, United States Code, Section 371, and entered into a cooperation agreement with the U.S. Attorney's Office, in the hope of obtaining leniency when he is sentenced. Information provided by Individual A has been corroborated by, among other things, e-mails, documents, consensual recordings, and interviews of other witnesses.

recorded telephone calls with Meredith to discuss the scheme. The calls were consensually recorded.

On April 12, 2018, Meredith traveled to Boston to meet with Individual A at a Boston-area hotel. During the meeting, which was also consensually recorded, Meredith and Individual A confirmed their earlier agreement that Meredith would designate Yale Applicant 2 as a soccer recruit in exchange for a bribe. They further agreed that the mid-six-figure bribe payment they had previously discussed would be $450,000. At the direction of law enforcement agents, Individual A provided Meredith with $2,000 in cash as partial payment for the bribery scheme.

On or about April 18, 2018, law enforcement agents wired Meredith an additional $4,000 as payment for the scheme. This wire transfer was from a bank account in Massachusetts to Meredith's bank account in Connecticut.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By: /s Eric S. Rosen
ERIC S. ROSEN
Assistant U.S. Attorney

Date: March 15, 2019

<u>Certificate of Service</u>

  I hereby certify that this document was filed on ECF on March 15, 2019, and will be sent via e-mail to participants as identified on the Notice of Electronic Filing as well as to Paul Thomas, Esq., counsel for Defendant Rudolph Meredith via e-mail.

           By: <u>/s/ *Eric S. Rosen*   </u>
              Eric S. Rosen
              Assistant U.S. Attorney