UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                              )
UNITED STATES OF AMERICA,     )
                              )
         Plaintiff,           )
                              )   Criminal Action
v.                            )   No. 19-10075-MLW
                              )
RUDOLPH "RUDY" MEREDITH,      )
                              )
         Defendant.           )
                              )
```

BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE

RULE 11

March 28, 2019

John J. Moakley United States Courthouse
Courtroom No. 19
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

APPEARANCES:

On Behalf of the Government:
Eric S. Rosen
Justin D. O'Connell
Leslie Wright
United States Attorney's Office MA
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3412
eric.rosen@usdoj.gov
justin.o'connell@usdoj.gov
leslie.wright@usdoj.gov


On Behalf of the Defendant:
Paul F. Thomas
Felice Duffy
Duffy Law, LLC
129 Church Street
Suite 310
New Haven, CT 06510
203-946-2000
felice@duffylawct.com
paul@duffylawct.com

Young Paik
Paik & Brewington LLP
92 State Street, Suite 700
Boston, MA 02109
617-439-0150
yp@paikbrewington.com

P R O C E E D I N G S

(Case called to order.)

THE COURT:  Good afternoon.  Would counsel please identify themselves for the court and for the record.

MR. ROSEN:  Good afternoon, Your Honor.  Eric Rosen for the government.

MR. O'CONNELL:  Good afternoon, Your Honor.  Justin O'Connell for the government.

MS. WRIGHT:  And Leslie Wright for the government, Your Honor.

MR. THOMAS:  Good afternoon, Your Honor.  Paul Thomas on behalf of Mr. Meredith.

MR. DUFFY:  Good afternoon, Your Honor.  Attorney Felice Duffy on behalf of Mr. Meredith.

MR. PAIK:  Good afternoon, Your Honor.  Young Paik for the defendant, Mr. Rudy Meredith.

MR. THOMAS:  And I should note that Mr. Meredith is seated beside me.

THE COURT:  Yes.  Thank you.

We're here today in connection with Mr. Meredith's request to waive indictment and plead guilty to the two charges against him.  As you know from the orders I issued yesterday and earlier tomorrow -- earlier today, I have some questions that I'd like to have addressed before we get to that to clarify or amplify certain points so I can properly question

Mr. Meredith.

I don't at the moment foresee any impediment to
concluding this this afternoon, but I did tell you in the order
that I issued yesterday that when I saw that Mr. Meredith was
the former Yale women's soccer coach, being a graduate of Yale
in 1968, I considered whether I had any actual bias or
prejudice.  And I don't.  I'll decide matters in this case the
way I would decide them if Mr. Meredith had coached someplace
else.

And I considered whether a reasonable person might
question my impartiality and came to the conclusion in the
circumstances I described to you that a reasonable person could
not.  But I wanted to, A, disclose that, and B, give you a
chance to ask me any reasonable questions you'd like to ask if
you have any questions or concerns about an appearance of
partiality.

MR. ROSEN:  Thank you, Your Honor.

First, the government respectfully notes there is a
3:30 initial appearance for another coach in this case.  If the
hearing runs past 3:30, AUSA Leslie Wright will probably step
out from the bench to attend that initial --

THE COURT:  Okay.

MR. ROSEN:  I don't want you to think we're being
disrespectful.

Second thing is, the government is not questioning

partiality. I would like to just put on the record just so it's clear for all the parties, if you could expand your analysis under the A prong about the impartiality, and might reasonably be questioned, just so it's clear for any appellate issues that might come out further down the road.

THE COURT: Okay. And does the defendant have any questions?

MR. THOMAS: No, Your Honor. I accept Your Honor's representations. Thank you.

THE COURT: I had occasion to discuss the standards that apply to 28 U.S.C. Section 455(a), the provision that says a judge should disqualify himself if a reasonable fully-informed person could question his impartiality. So those are the standards I've applied here.

And I wrote about four pages on what the standards were, so I don't mean, if I mention just part of them, to exclude the rest. But, for example, the First Circuit has cited and quoted then Judge Anthony Kennedy's -- actually perhaps he was on the Supreme Court when he wrote it -- Justice Anthony Kennedy's statement that Section 455(a) is triggered -- 455(a) gets implicated when there's no actual bias or prejudice but to preserve public confidence in the administration of justice. It is necessary that a judge disqualify himself if a reasonable person could nevertheless question his impartiality, if that person was fully informed.

1       So the Supreme Court in <u>Liteky</u>, 510 U.S. at 557-58, or

2    actually Justice Kennedy concurring, the First Circuit

3    reiterating in cases like <u>Snyder</u> and <u>In re United States</u>,

4    Section 455(a) is triggered by an attitude or state of mind so

5    resistant to fair and dispassionate inquiry as to cause a

6    party, the public or reviewing court, to have a reasonable

7    grounds to question the neutral and objective character of the

8    judge's rulings or findings.  I think all would agree that a

9    high standard is required to satisfy this standard, thus, under

10   Section 455(a), a judge should be disqualified only if it

11   appears that he or she harbors an aversion or hostility or

12   disposition of a kind that a fair-minded person could not set

13   aside when judging the dispute.  And as the Second Circuit said

14   in <u>In re Aguinda</u>, 241 F. 3d 194 at 204, in essence, "The

15   presumption is that a judge will put personal beliefs aside and

16   rule according to the laws enacted, as required by his or her

17   oath."

18       So as I told you, I graduated from Yale in 1968.  I'm

19   grateful for the opportunity to have gone there.  I didn't

20   write that.  I make what by Yale's standards is a modest

21   contribution each year to the annual fund and pay dues.  I made

22   a somewhat larger contribution in connection with my 50th

23   reunion last year.  But I don't think that in -- I don't

24   believe that in those circumstances any reasonable person could

25   think that I would violate my oath to impartially administer

1  the law, and I'm confident I won't.  Therefore, I am not

2  recusing myself.

3       And indeed, the First Circuit has repeatedly written

4  that when a reasonable person wouldn't -- couldn't question a

5  judge's impartiality, the judge should sit.  So that's my

6  reasoning.

7       MR. ROSEN:  Thank you.

8       THE COURT:  And I'll note that under 28 United States

9  Code Section 455(e), the parties can waive any possible basis

10  for disqualification under Section 455(a), although not waive

11  actual bias or prejudice under (b).

12       Does the government wish to waive any objection under

13  455(a)?

14       MR. ROSEN:  Absolutely, Your Honor.

15       THE COURT:  And the defendant?

16       MR. THOMAS:  We join in that.

17       THE COURT:  Okay.  All right.

18       And Mr. Rosen, you were concerned about potential

19  issues on appeal where things change.  That's -- well, first of

20  all, I want to get things right.  But second, I, too, would

21  like this to be final as well as fair.

22       I'm dealing with another case now where a defendant

23  represented by a very experienced Criminal Justice Act counsel

24  says his lawyer told him that if he pled guilty, after I denied

25  a motion to suppress, he retained his right to appeal that

1    decision.  It wasn't a conditional plea.  So we want to get it

2    right for a variety of reasons, but one is so we only do all of

3    this once, okay?

4         All right.  I think it would be helpful to me if,

5    starting with the government particularly, you would give me an

6    overview of these charges, perhaps the genesis of the case.  As

7    I was beginning to prepare for this yesterday, I issued the

8    order telling you about a number of questions that came to my

9    mind, some of which will relate to the colloquy with the

10   defendant, Mr. Meredith.  But I think if you give me an

11   overview and try to address some or all of the issues I raised

12   in the order yesterday, that would be helpful.

13        MR. ROSEN:  Judge, I'm more than happy to do that.

14   Most of this is public now, so I know in the cooperation

15   agreement we had decided to reveal, subject to your order, and

16   we've read the orders.

17        THE COURT:  Well, it was revealed anyway.  Part of the

18   reason I issued my order was in the complaint you identified

19   the CW-3 as the former Yale soccer coach.  So there's no proper

20   basis for keeping under seal something that the government has

21   made public.

22        MR. ROSEN:  That's accurate, Your Honor.

23        The case began, I would say officially, in sort of the

24   February/March time period of 2018.  We executed a search

25   warrant in Los Angeles, as stated in the statement of facts, at

a home of a person suspected of being involved in a securities

fraud, specifically, pump and dump schemes in the United

States, Canada and Switzerland.

Like many individuals involved in that, they choose to

come in and cooperate with the government, in early March this

individual came in and cooperated and engaged in a multi-day

proffer with the government.  As is usual in a case involving

securities fraud, I was present there for the proffer primarily

along with some of my colleagues as well as agents from the

FBI.

During the time of that proffer, the cooperator

revealed that he had been engaged for some time in a bribery

scheme with the current defendant, Mr. Meredith, and that

bribery scheme had originated probably in the summer of 2017.

And when I say "probably," it's because it's sometimes hard to

pinpoint the exact date an agreement is arrived upon between

two parties to bribe someone.

And the amount of the bribe actually had not been set

yesterday.  It was going to be in the six-figure range, but

they were still sort of -- I don't want to say haggling over

the price, but they were still engaging in talk over that.  But

payments had been made from the individual in Los Angeles to

Mr. Meredith in Connecticut.

So reading your order yesterday about sort of

manufacturing jurisdiction and things like that, by the time

1    the government stepped in in the spring of 2018, the crime had

2    been already been completed.  We already had the agreement to

3    bribe.  It was really just a corroboration at that point.  So

4    in sort of beginning in mid-March, mid to late March, and

5    continuing up through April --

6              THE COURT:  Let me just clarify something for my

7    understanding.  The individual in Los Angeles that you just

8    mentioned, is that the father or family member of applicant 2,

9    the source, the person in Count Two, or is that somebody else?

10             MR. ROSEN:  That is the father of applicant 2.  So

11   that brings up sort of another point.  As Your Honor aptly

12   noted in your order, there were some ministerial errors in the

13   information.  And the agreement with Rick Singer was not part

14   of any agreement with applicant 2.  And that was, obviously,

15   the government's fault.  We take responsibility for that.  It

16   wasn't meant to deceive.  There was just obviously a lot going

17   on at the time of drafting --

18             THE COURT:  Just to make sure I understand this, so

19   the information as it's written in paragraph 23 incorporates

20   allegations in paragraphs 1 to 22, including 17 to 22, which

21   relate to applicant 2, but those charges, you're telling me,

22   should not be regarded as part of the alleged conspiracy with

23   Singer, as you use the word in your statement of facts; that's

24   a separate crime of conspiracy?

25             MR. ROSEN:  There are three errors, Judge, in the

information.  The first is paragraph 23 should not incorporate by reference paragraphs 1 through 22.  It should incorporate paragraphs 1 through 16, purely the conspiracy.

Count Two should be -- it's the same error.  Instead of incorporating paragraphs 1 through 22 it should be essentially -- well, the beginning part is the same, but it should be focused on the factual allegations in paragraph 17 through 22.  There are two separate crimes involving the same victim.  And that was a ministerial error.  There is an error also in the caption of that count.  It says, "Honest services wire fraud."  It should say, "Honest services wire fraud and wire fraud."  And that's an error as well.

THE COURT:  All right.  Well, okay.  And this is helpful.

MR. ROSEN:  So essentially, this is going back to the facts, beginning in sort of March through April, about a one-month period --

THE COURT:  Let me pause you for just a moment because it relates to another -- here, keep going, keep going.

MR. ROSEN:  Okay.  Beginning in approximately March through April of 2018, the person in Los Angeles made a series of reported telephone calls to the defendant.  And this has been publicly stated on the record.

In those telephone calls, they satisfy -- already satisfy the elements of the crime, and it was also from Los

1 Angeles to Connecticut, in which they talked about an exchange

2 of a recruitment spot at Yale in exchange for a still

3 undetermined amount of money.

4 On April 12 or approximately on that date, the

5 individual from Los Angeles came to Boston, Massachusetts.

6 Mr. Meredith came up from New Haven, Connecticut.  They met in

7 a hotel room here in Boston, Massachusetts.  This was recorded

8 on video.

9 At that time, approximately at that time, it happened

10 together, we obtained bank records for Mr. Meredith.  And in

11 the meeting in the hotel room, which is recorded on video, as I

12 said, they finalized the price of $450,000.  Mr.  Meredith was

13 provided with $2,000 in cash.  And they also mentioned an

14 individual named Rick Singer.

15 THE COURT:  Who mentioned Mr. Singer?

16 MR. ROSEN:  The defendant.

17 THE COURT:  Is that the first you had heard of

18 Mr. Singer?

19 MR. ROSEN:  Indeed it was.  So we obviously watched

20 the video, and we got the bank records, and we saw that

21 Mr. Meredith had obtained approximately $860,000 from

22 Mr. Singer in the years leading up to that meeting in the hotel

23 room.

24 So one of your questions asked in the order was why

25 wasn't -- Mr. Meredith was then -- about a week later, he

became a government cooperator as well.

So the question in the order was why wasn't Mr. Meredith charged with the RICO. Because at the time he began cooperating pursuant to a proffer agreement and pursuant to standard policies, we didn't know about the RICO. It wasn't -- it wasn't on our radar. We had learned about that through Mr. Meredith, the phone calls, dozens and dozens of subpoenas, search warrants and an extremely extensive investigation that ultimately led to charges against, I believe, 50 people.

THE COURT: So are you communicating to me that pursuant to guideline Section 1B1.8(a), you didn't -- you didn't feel you could use the information that Mr. Meredith gave you to include him in a RICO charge?

MR. ROSEN: That is correct. At the time we only had the honest services charge against him because we were unaware of the enterprise.

THE COURT: The honest services charge, based on the comment made in the hotel room?

MR. ROSEN: Based on the comment made in the hotel room, based on bank records, ultimately based on emails obtained through a variety of different processes. So that's the extent of why a RICO was not charged against Mr. Meredith.

I also note, for what it's worth, that I don't believe the guidelines are affected by the lack of a RICO charge. It's

1    simply a means for obviously --

2            THE COURT:  And each count of mail fraud has, what, a

3    20-year maximum?

4            MR. ROSEN:  That's correct, yeah.

5            THE COURT:  And has the prospect of a downward

6    departure from the guidelines, which will be less than 20

7    years, I assume?

8            MR. ROSEN:  Yes, I imagine.

9            THE COURT:  So it's not likely to have a practical

10   effect on what the ultimate sentence is?

11           MR. ROSEN:  I completely agree with that, yes.

12           THE COURT:  That's your position.  I'm trying to see

13   if I understood your position.

14           MR. ROSEN:  Correct.  So the two charges are separate

15   charges, the first based on the conspiracy with Singer and

16   others, and that would include, we believe, sort of the network

17   of people; and the second charge is purely based on his

18   interactions with the father of Yale applicant 2.

19           THE COURT:  Well, the first charge involves, in some

20   places I think you say the father and in some places you say

21   the family of Yale applicant 1.

22           MR. ROSEN:  Correct.

23           THE COURT:  Again, this has some practical

24   significance.  I'm going to set a sentencing date.  But is

25   there a prospect of a superseding indictment in this case that

1   will -- or have you charged in a complaint the father or family
2   of applicant 1?
3           MR. ROSEN:  Judge, that's -- an investigation is
4   ongoing.  If I can limit it to that, that would be fine.
5           THE COURT:  Okay.  All right.  So that's not somebody
6   charged in a complaint as of now?
7           MR. ROSEN:  There hasn't been charges publicly
8   revealed about the family of the Yale applicant 1, if those
9   charges were to exist.
10          THE COURT:  Okay.  Keep going.  This is very helpful.
11          MR. ROSEN:  So essentially, so that was April of 2018
12  in which Mr. Meredith began cooperating.  Mr. Meredith then
13  began making phone calls to Mr. Singer in California.  And
14  those calls were designed to corroborate what we had learned
15  from email search warrants as well as bank records as well as
16  to lay the foundation for a wiretap of Mr. Singer's telephone.
17          We had learned through the recorded telephone calls
18  that this obviously was not related to a single bribe paid to a
19  single coach but rather a scheme, a scheme to defraud the
20  universities of the honest services of their employees as well
21  as the property that they -- the admissions slot for Yale.
22          So we began making a series of recorded calls.  We
23  received an additional payment from Mr. Singer.  And then as
24  stated in many publicly available documents, the wiretap began
25  in early June of 2018.

1        At that point, Mr. Meredith obviously had been

2    cooperating, and the wire tap lasted for some time.  During

3    that time period Mr. Meredith continued to make some additional

4    calls, not very many because at that point we were

5    intercepting, according to court-authorized orders,

6    Mr. Singer's telephone, and we did that pursuant to, you know,

7    court authorization for a period of approximately four months,

8    interception of both the telephone calls, text messages as well

9    as the emails of Mr. Singer.  And during that time we executed

10   also a number of search warrants under his email accounts in

11   the case that's been set forth in numerous charging documents

12   in court.

13        THE COURT:  And when we get to sentencing, I'm going

14   to have to start by correctly calculating the guideline range.

15   Is there evidence -- will there be evidence of essentially

16   relevant conduct that Mr. Meredith engaged in, you know, took

17   bribes more than two times?

18        MR. ROSEN:  The number -- the number set forth in --

19   well, you know, in the information and also I believe in the

20   statement of facts is approximately $1.31 million for intended

21   loss.  And that includes 860,000 for Mr. Singer and

22   approximately 450,000 for the father of Yale applicant 2, but I

23   note that that amount was not paid.  It was agreed upon, of

24   which only $6,000 was paid.

25        THE COURT:  All right.  But those are the two counts

1  in the indictment, right?

2            MR. ROSEN:  Correct.

3            THE COURT:  So under --

4            MR. ROSEN:  Are you asking --

5            THE COURT:  Under the guidelines, if there's relevant

6  conduct --

7            MR. ROSEN:  Right.

8            THE COURT:  -- I have to include it to calculate the

9  guideline range, which is the starting point for determining

10  the sentence.  So my question -- maybe I'll take it a step

11  back.  Have you investigated whether there were other bribes,

12  which will probably be part of the same common scheme or plan;

13  and if so -- well, you preserved in your cooperation agreement

14  the authority to meet your obligation to respond to Probation

15  and the court with regard to questions that might affect the

16  guideline range.

17            I don't know if Mr. Meredith's one of the few people

18  in my many years who had the misfortune of getting caught the

19  first time out, but you'll have this conversation and colloquy

20  with your colleague, Mr. Grady, in the DeJong case, 18-10307.

21  In fact, I'll ask Ms. Bono to give you each a copy.

22            MR. ROSEN:  Okay.  I can answer your question, Judge.

23            THE COURT:  Let her -- here.  Answer the question.

24            MR. ROSEN:  The answer is twofold.  The answer is,

25  beyond the monetary payments of 860 and 450, do we have

1  evidence of additional bribe payments.  And the answer is no.

2  The 860, though, was not for one applicant to Yale.

3          THE COURT:  Have you sought to -- did you try to

4  acquire more evidence?

5          MR. ROSEN:  We did.

6          THE COURT:  Okay.

7          MR. ROSEN:  And, you know, obviously an information,

8  we did not -- I mean, it's an extremely extensive

9  investigation, so we try to keep it a little short.  So we

10  didn't lay out all the evidence in the information.  And there

11  wasn't an intent to deceive.  It was simply we didn't want to

12  make it --

13          THE COURT:  Here.  I'll have Ms. Bono give you each a

14  copy of the February 11, 2019 DeJong order.  And if it would

15  raise a problem you think with regard to your obligation --

16  well, anything you learn from Mr. Meredith in a proffer

17  pursuant to your cooperation agreement, it appears to me, can't

18  be used against him at sentencing.

19          MR. ROSEN:  That's correct.

20          THE COURT:  It doesn't mean you don't have to disclose

21  it to Probation or the court, and it doesn't mean that there's

22  not other information.  You just said there was.  And I just

23  need everything, and then I can decide what I can consider

24  because I have to calculate the guideline range to start the

25  sentencing.  But here, Ms. Bono will give it to you.

1      MR. ROSEN:  The monetary amount, Your Honor, we

2  believe is complete, the 1.31 million.  I do not believe

3  there's evidence that exists of additional --

4      THE COURT:  That's helpful because I didn't know where

5  the 860 came from.

6      MR. ROSEN:  Yeah.

7      THE COURT:  She'll give you this.  <u>United States v.</u>

8  <u>DeJong</u>, 18-10307, docket number 43.  And if, in communicating

9  with Probation or filing your sentencing memo, you think you

10 have a problem, an issue as to what you ought to disclose, tell

11 me and we'll figure it out.

12     MR. ROSEN:  Okay.

13     THE COURT:  I'll decide.  Go ahead.

14     MR. ROSEN:  Well, that's sort of almost toward the

15 end.  We did the sort of -- as publicly stated, we obviously

16 did the wiretap for a period of four months, and then we moved

17 into a consensual period for a period of time as well, leading

18 up to unsealing the charges on March 12, 2019.

19     And during that time period Mr. Meredith, the

20 consensual period, it wasn't obviously Mr. Meredith's

21 telephone, but it was -- I don't believe we -- we were not

22 actively using him as a cooperator during that time period.

23     THE COURT:  All right.  I've got a few more questions

24 for you, though.

25     MR. ROSEN:  Sure.

1          THE COURT:  And then I think I'll want to hear from

2    Mr. Duffy.

3          All right.  So with regard to Count One.

4          MR. ROSEN:  Yes.

5          THE COURT:  When I exclude, as you've asked me to do,

6    paragraph 17 to 22 --

7          MR. ROSEN:  Correct.

8          THE COURT:  -- there's no alleged connection with the

9    District of Massachusetts I think, right?

10         MR. ROSEN:  Well, A, how you frame the conspiracy is

11   important here.  There was -- Mr. Meredith was obviously part

12   of a larger conspiracy involving the defendant and also Singer

13   and other people like that.  During the time period of the

14   conspiracy, there were multiple overt acts that took place in

15   the District of Massachusetts.

16         THE COURT:  This sounds to me, this is just what I was

17   trying to get at.  This sounds to me inconsistent with what you

18   told me before; that Count Two is separate from the conspiracy

19   with Singer.  I have to -- you gave it to me.  I give it to the

20   jury all the time.  I have to make sure that the defendant is

21   pleading guilty to the conspiracy charged in the information

22   and not some other conspiracy or conspiracies.  So I don't, at

23   the moment, see how applicant 2 can be an overt act in

24   furtherance of the separate conspiracy with Mr. Singer.

25         MR. ROSEN:  I agree.

1          THE COURT:  This is my concern.  And then, you know, I

2     try to -- I read through this, and I wish I had known you made

3     a mistake and had a superseding information.  This would have

4     been easier.  But you have in the plea agreement a waiver of

5     right of venue.  This is one of the things I have to question

6     the defendant about.  In Count One, you allege that the conduct

7     occurred in Connecticut and elsewhere, but you don't say in

8     Massachusetts.

9          MR. ROSEN:  Right.

10         THE COURT:  In Count Two you say Massachusetts.  So

11    one, I don't at the moment foresee this is going to be material

12    to anything I have to decide, but it doesn't -- based on what

13    you told me earlier about Count Two being separate, I don't

14    know that the conduct involved in Count Two would create venue

15    in Massachusetts.

16         MR. ROSEN:  Well, I agree with that.  Count Two is

17    entirely separate from Count One.  Count One involves a

18    conspiracy with Rick Singer and others known and unknown, which

19    we would include in that the other coaches that are involved in

20    the scheme.  And during that time period of the conspiracy, for

21    those people, not Mr. Meredith, there were numerous overt acts

22    involved in the District of Massachusetts, including mailings

23    of payments for bribes to the District of Massachusetts as well

24    as applications to schools containing falsified scores and the

25    like.  So there is venue here.  We put it in the information.

1    We also, we trimmed it down to the District of Connecticut and

2    elsewhere just to simplify for the court and jurors.

3         THE COURT:  I don't think it simplifies it.  It

4    complicates it.  Because if we were to try this case, which I

5    expect we're not going to be doing, I'd have to decide whether

6    the jury could convict based on uncharged overt acts, whether

7    the defendant had fair notice of it.  But I thought that you

8    were saved on this issue by the waiver of venue.

9         But this is something I've got to ask Mr. Meredith

10   about, and I haven't encountered Mr. Duffy before.  I now

11   realize that he's got a lot of experience with the federal

12   system, so I'm confident he knows what I'm talking about and

13   has by this point talked to his client about it.

14        MR. ROSEN:  I mean, the waiver of venue obviously is

15   applicable here.  Your Honor noted in his order that obviously

16   defendants can waive venue.  So however we want to do it --

17        THE COURT:  It's not so obvious.  I had to go and do a

18   little research.  But it actually was pretty obvious because I

19   found the cases myself.  I didn't have to rely on my brain

20   trust.

21        MR. ROSEN:  I think regardless of how we want to sort

22   of splice this particular case, I do believe there would be

23   venue for the overall conspiracy in the District of

24   Massachusetts.  It's charged as such in other counts in other

25   charging instruments with different judges.

1    THE COURT:  Not in this case.  But it's okay.  We'll

2  go one step at a time.  But Mr. Duffy, am I right that --

3  Mr. Thomas, I'm sorry, am I right that the defendant is waiving

4  any objection to venue on Count One in the District of

5  Massachusetts?

6    MR. THOMAS:  That's correct.  And I think Your Honor

7  anticipated that had been a matter of consideration in the

8  court's order.  Indeed that was something that I identified as

9  a potential complicating issue that wouldn't not be in the

10  larger picture in Mr. Meredith's interest, given the

11  jurisdiction over the other count here.  And rather than divide

12  and have complicated litigation in Connecticut, here in Boston,

13  let's bring it together, particularly since our goal is to

14  resolve.  And so Your Honor did see that correctly, and we have

15  discussed that, and it did make I think profound sense to waive

16  venue.

17    THE COURT:  No.  That's very helpful.  All right.

18  Well, I expect with regard to Count One I'm going to proceed

19  based on the waiver and that -- you know, it's a reasonable,

20  responsible thing for effective counsel to do in the

21  circumstances as I understood them when I issued the order

22  yesterday and as I'm coming to understand them better.

23    In the plea agreement, as I pointed out yesterday, in

24  paragraph 1 it says --

25    MR. ROSEN:  Sorry, which paragraph?

1        THE COURT:  Paragraph 1, docket number 17.  "Defendant

2   also agrees to waive venue, waive any applicable statute of

3   limitations."  Is there a statute of limitations issue?

4        MR. ROSEN:  No.  It's just --

5        THE COURT:  Okay.  "And to waive any legal or

6   procedural defects in the information."  Maybe I haven't been

7   reading other plea agreements recently closely enough because

8   so many of them are essentially the same.  But what does that

9   mean, "to waive any procedural defects in the information"?

10       MR. ROSEN:  Judge, it is a standard provision, we

11  believe, in our plea agreements.  I believe -- obviously, we

12  came here and discussed a couple of errors in the information.

13  I think it just refers to that.  I don't think it's a legal

14  procedural defect, but if it was, the point I think is just to

15  generate a finality for the proceedings and not to go back on

16  little tiny ministerial errors like those that were committed.

17       THE COURT:  I don't know that it's so tiny.  It used

18  to be that all the indictments were reviewed by -- this was a

19  long time ago -- the chief of the criminal division, Deputy

20  U.S. Attorney, me, the U.S. Attorney, and in some cases by the

21  Department of Justice.  But it is just important to know what

22  the allegations are, particularly because they affect venue.

23       All right.  So basically like a legal defect would be

24  an error that you made in paragraph 23 by incorporating

25  paragraph 17 to 22 about applicant 2?

1      MR. ROSEN:  That's correct.

2      THE COURT:  This is very helpful because I have to

3   assure that Mr. Meredith understands this, but I can't do that

4   unless I think I understand it.

5      MR. ROSEN:  I understand.

6      THE COURT:  All right.  I am going to talk to you

7   about the jury instructions that I propose to give, but why

8   don't I hear from Mr. Duffy -- Mr. Thomas, I'm so sorry --

9   Mr. Thomas first.  He responded on one thing, but you see all

10  the issues I raised yesterday, and the one I raised today we'll

11  get to, but what would you like to say?

12     MR. THOMAS:  So I agree with the government's

13  chronology of the development, investigation, evolution of this

14  case.  We came into the case shortly after that event with

15  Mr. Meredith here in this district.  I'm not sure that -- based

16  upon what the government's evidence was, we have come to the

17  agreement that's before Your Honor, which is to resolve this

18  matter with a plea to two charges that I think fit.  I

19  understand that there are some perhaps esoteric but nonetheless

20  fundamental questions about what the crimes are, and I think

21  that it is my review of it, and I may be getting ahead of where

22  Your Honor wants to be --

23     THE COURT:  That's okay.  Go ahead.

24     MR. THOMAS:  But I do believe that the honest services

25  is really quite a clear charge in this case.  The iffiness

1  comes down where there are not bribes, there are not kickbacks.

2  But I think under Skilling it's pretty clear.  They used an

3  interesting archaic term, I think pole-staff [sic] was the

4  word, clear as a pole-staff [sic].  We had to look that up to

5  find out what that meant.  It goes back to the 1600s.  But what

6  that essentially translates to is it's clear that those types

7  of honest services violations are indeed fraudulent within the

8  statute.

9        THE COURT:  Well, this is why I wanted to -- there are

10  certain features of the instructions I'm going to give

11  Mr. Meredith that I want to point out, then I'm going to ask

12  you to do what you would do anyway, both of you, all of you,

13  listen carefully to my instructions and tell me whether you

14  think they're inaccurate or incomplete in some material way.

15  But as you know from the order I issued this morning, that I

16  have -- is there something you'd like to say before I go to the

17  jury instructions?

18        MR. THOMAS:  There is one point that Your Honor raised

19  about the conspiracy charge and the scope of that and it might

20  be relevant conduct.  And while we are here because we believe

21  the elements of the charged conspiracy are indeed provable with

22  the evidence the government has and that Mr. Meredith intends

23  to admit to, I think his conspiracy was far narrower.  He did

24  not know about, you know, much of what was going on outside of

25  his own particular field, if you will.

1     THE COURT:  Well -- I'm sorry.  Go ahead.

2     MR. THOMAS:  He was aware of the possibility, but he

3 wasn't a participant in anything beyond what he did.

4     THE COURT:  Well, if I had to instruct the jury, I

5 expect I'm going to instruct them that he didn't have to know.

6 The question is what's reasonably foreseeable.

7     MR. THOMAS:  That would be an interesting issue where

8 we could go down that line.  I think nonetheless --

9     THE COURT:  I hadn't focused or thought of that.  I've

10 been thinking more of the situation that I have in DeJong, and

11 that is whether there's likely to be other relevant conduct or

12 relevant conduct that the government knows about that would

13 affect the guideline calculation, which is only the starting

14 point.  And ultimately I'm going to give whatever sentence is

15 sufficient and no more than necessary.  And if the government

16 makes a 5K1.1 motion based on substantial assistance, those are

17 usually granted and rewarded.  But, you know, the Supreme Court

18 says I have to start by correctly calculating the guideline

19 range.

20     MR. THOMAS:  Understood.  And I would represent that

21 as far as we know, the government got it right; that they did

22 find the universe of wrongdoing.

23     THE COURT:  All right.

24     MR. THOMAS:  And that is within the two counts that

25 are charged.

1          THE COURT:  All right.  Let me see if I've got it.  So

2     you've discussed with Mr. Meredith that he's waiving venue.

3     I'll ask him, you know, you may have a right to have Count One

4     tried in Connecticut or California, wherever, someplace else,

5     but he's content to go ahead with Count One in Massachusetts.

6          MR. THOMAS:  We have discussed that --

7          THE COURT:  And I think he has also waived his right

8     to complain about legal or procedural defects.  In many cases I

9     would require the government to file a superseding information,

10    and maybe they should do that anyway to correct the errors, but

11    I don't think -- I'm not going to say that's an impediment to

12    going ahead today.

13         MR. THOMAS:  And we've talked about that, and it is

14    not -- I think within the charging document there are properly

15    alleged foundation -- and that going that route or amending it

16    or challenging it in some way would be unnecessary and wasteful

17    expenditure of time and resources.

18         And I should say I agree with Mr. Rosen's analysis of

19    the problem that was created by the over-incorporation of

20    paragraphs in one count and the other and that he clarified

21    what should be included, and with that understanding, that

22    alleges properly the criminal charge.

23         THE COURT:  Actually, there is one other thing, I

24    think at least one other thing I ought to discuss with you.

25    When I perceived that venue was not in Massachusetts, absent

1    the waiver, and that Mr. Meredith evidently had been lured here
2    as part of an undercover operation, at that point I wondered
3    whether there might be a defense of what's called manufactured
4    jurisdiction, a variation of entrapment.  And I wanted --
5    again, you haven't been before me before.  I try to be as
6    transparent as possible.  There are many cases and there are
7    many other lawyers who may contest those cases, and I think
8    they're going to raise a number of issues.  And I don't want to
9    get in the situation where Mr. Meredith says to me, you know,
10   my lawyer didn't tell me about that; or, gee, if I had known
11   there was that issue, maybe I would have done something
12   different.

13          So I looked at manufactured jurisdiction, which I
14   litigated in the Djokich case in 2010, and if I amplify what I
15   wrote yesterday based on what I know, which is more than I
16   often know when I take a plea but not what I know after a
17   trial, there probably wouldn't be a manufactured jurisdiction
18   instruction that I would give the jury because there would have
19   to be sufficient evidence of no predisposition to commit the
20   crime.  And at least when I was dealing with this in 2010, it
21   was unclear whether manufactured jurisdiction could be a basis
22   for an outrageous government misconduct due process violation,
23   but I don't think -- in 2010, no court had ever found one, and
24   therefore I expressed the view yesterday that effective
25   counsel, it would be within the range of professional

1  competence, it would be effective to say to Mr. Meredith we

2  don't want to go to trial relying on that.

3        Was that your reasoning, too?

4        MR. THOMAS:  Fundamentally, yes.  It may well be in

5  these dozens of other cases pending there will be counsel of

6  who have a different view of what's in their client's interest.

7  It has been, in Mr. Meredith's view, his interest to accept

8  responsibility and resolve the case.  And I think raising those

9  kind of claims about entrapment or things of that nature would

10  not further that one step.  So Your Honor is again correct

11  about how we have analyzed and thought about the case.

12        THE COURT:  And I'll ask Mr. Meredith of course

13  whether he's satisfied with your representation of him.  But as

14  I said, based on what I know, advising him not to litigate

15  this, that issue, to go to trial because of that issue, is very

16  reasonable.

17        MR. THOMAS:  Appreciate that.

18        THE COURT:  What I think was not right is what I

19  pointed out this morning, when I read Skilling.  On page 4 of

20  docket 18, statement of facts, to which the defendant --

21  statement of law to which the defendant said in its submission

22  this morning thought it was correct.  The government wrote,

23  "The honest services wire fraud charge requires that the

24  defendant knowingly participate in a scheme to defraud Yale of

25  its right to the honest services of its employee -- here the

defendant himself -- through bribes or kickbacks."  That I
think is correct.  Then it goes on to say, "Notably, it may be
fraudulent if a person in a fiduciary relationship owing a duty
of loyalty to another, such as an employee-employer
relationship, fails to disclose information he knows should be
disclosed and fails to disclose it with intent to defraud
another."  And the cite is to Skilling, 561 U.S. 358, 401.
Well, in 401, the Supreme Court is citing another case,
Bohones, for that language, but that's what I think it
expressly rejects on page 409.

It says, "The government urges us to go further," that
is, beyond bribery, "by locating within Section 1346's compass,
another category of proscribed conduct:  'undisclosed
self-dealing by a public official or private employee -- i.e.,
the taking of official action by the employee that furthers his
own undisclosed financial interests while purporting to act in
the interests of those to whom he owes a fiduciary duty.'"

So I think it was rejecting the case it was quoting on
401.  And I'm interested in hearing you on this.  But I believe
a bribe in the circumstances of this case is an essential
element of the honest services fraud charges.

MR. ROSEN:  Correct.

THE COURT:  And absent a bribe, the federal offense.

MR. ROSEN:  And I would agree with you.  I think
Skilling is very clear that honest services post-Skilling

applies only to bribes and kickbacks, and the government shares
that view.  I don't think that -- and I think we say that.  I
mean, it requires the defendant knowingly participate in a
scheme to defraud Yale and its right to the honest services of
its employee through bribes and kickbacks.  And here I don't
think anybody is in dispute that Mr. Meredith received $860,000
to recruit at least one applicant for a soccer spot allocated
by Yale and agreed to recruit a second one for $450,000.
That's a clear bribe --

THE COURT:  And that's why I don't see an impediment
to going forward.  But I asked you for the proposed jury
instruction and statement of facts because I thought it might
make it easier for me to question the defendant.  I haven't
instructed on honest services fraud since the DiMasi case,
which was affirmed in McDonough.  But then when I focused on
this this morning, I think it's just wrong, and it shouldn't
have been in there.

MR. ROSEN:  Okay.

THE COURT:  And I'm not going to be relying on that in
instructing -- unless you want to be heard on it -- instructing
the defendant or presumably -- well, if I'm satisfied,
accepting the plea.

MR. ROSEN:  No, Your Honor.  That's fine.  I think the
import after the bribe and kickbacks is that the information
failing to disclose obviously is the fact that the person is

getting a bribe or kickback, that's the fraud committed upon

the -- that's material knowledge that the employer would want

to have in making a decision.

THE COURT:  All right.  But in this case the facts,

the facts involve a bribe so --

MR. ROSEN:  Correct.

THE COURT:  -- there's not a problem.  But I believe

that statement is an incorrect statement of the law.

There are two other, at least, issues embedded in the

jury instruction.  One, I intend to instruct that the

government would have to prove beyond a reasonable doubt that

Mr. Meredith had a fiduciary duty to Yale and that I find that

an employee does have a fiduciary duty to his employer.  They

said that in Skilling, said it was obvious, 561 U.S. 358 at

402.  There's a Ninth Circuit case that I found helpful.

Milovanovic, 678 F. 3d 713 at 724.  But I expect, if I were

trying this case, this could be a contested issue because there

is some jurisprudence that says you look to state law to see if

there's a fiduciary relationship, duty, and there doesn't seem

to be one under common law in Massachusetts.  Probably in

Connecticut they rely on the restatement.

But I think for the purposes of this case there is a

fiduciary duty.  I'm proceeding with that understanding.  And

then I also, and your submission was helpful on this, intend to

instruct Mr. Meredith that the right to make a properly

1    informed decision and control who was admitted to Yale is a

2    form of Yale's property for the purpose of the wire fraud

3    theory that requires obtaining money or property by material

4    false statements; and you cited Frost, 125 F. 3d 346 at 367,

5    and Gatto, 295 F. Supp. 3d 336 at 347.  It seems to me that

6    those are right.  It might seem to someone else it's not.  You

7    agree that that's the law, right, Mr. Thomas?

8         MR. THOMAS:  Right.  We have not disputed that.  Those

9    are really alternative ways to prove the crime.  If we were to

10   have litigated this, in the end I suppose we would have asked

11   the jury, asked Your Honor to instruct the jury to make a

12   decision as to which or both.

13        THE COURT:  I know.  Usually the instructions conflate

14   them and you might find me doing that somewhat -- well, not

15   conflating but not separating them.  Okay.  But I think those

16   were the major jury instruction related issues that I perceive.

17        Okay.  So I think we're ready to for me to question

18   Mr. Meredith regarding whether he wishes to waive indictment

19   and proceed on the information and plead guilty.  So he should

20   approach the witness stand and be sworn, and Mr. Thomas, you

21   may go with him with a copy of the two documents that

22   constitute the plea agreement, plea agreement and cooperation

23   agreement.

24        (Defendant duly sworn.)

25        THE COURT:  Would you please state your true full

```
 1   name.
 2              THE DEFENDANT:  Rudolph Meredith.
 3              THE COURT:  Mr. Meredith, do you understand you've
 4   just taken an oath to answer the questions I'm going to ask you
 5   truthfully and any failure to do that could be a separate
 6   prosecutable criminal offense?
 7              THE DEFENDANT:  I do, Your Honor.
 8              THE COURT:  And do you understand that if you're
 9   confused by any of my questions or unsure about what an honest
10   and accurate answer would be, I'll let you speak to Mr. Thomas
11   so we can clear up any confusion and you can give me a reliable
12   response?
13              THE DEFENDANT:  I do, Your Honor.
14              THE COURT:  How old are you?
15              THE DEFENDANT:  51.
16              THE COURT:  Have you ever been arrested or convicted
17   under any name other than the name you just gave me?
18              THE DEFENDANT:  No, no.
19              THE COURT:  How far did you go in school?
20              THE DEFENDANT:  I just finished my master's degree
21   last summer.
22              THE COURT:  And have you ever been treated for mental
23   illness or drug addiction?
24              THE DEFENDANT:  No.
25              MR. THOMAS:  May we have a moment, Your Honor?
```

```
1              (Defendant confers with counsel.)

2              THE COURT:  Yes.  Was there a matter when you were in

3    college --

4              THE DEFENDANT:  Yes.

5              THE COURT:  -- that you got some counseling therapy

6    for?

7              THE DEFENDANT:  Yes, yes, but I didn't see a doctor.

8    I talked to a counselor who was a friend.

9              THE COURT:  Okay.  That's fine.  You don't have to say

10   more.

11             How long ago were you in college?

12             THE DEFENDANT:  I graduated in 1992.

13             THE COURT:  Okay.  And are you now under the influence

14   of any drug, medication or alcohol?

15             THE DEFENDANT:  No, Your Honor.

16             THE COURT:  Have you been given a copy of the

17   indictment, the information with two charges against you?

18             THE DEFENDANT:  Yes, Your Honor.

19             THE COURT:  Did you read it?

20             THE DEFENDANT:  Yes, Your Honor.

21             THE COURT:  Did you discuss it with Mr. Thomas?

22             THE DEFENDANT:  Yes, Your Honor.

23             THE COURT:  And I'll ask you about this again later.

24   Do you understand that each of those charges is what is called

25   a federal felony, meaning an offense that's punishable by more
```

1  than one year in prison?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  And do you understand that under the

4  Constitution of the United States, when a federal felony is

5  involved, you have a right to be charged in an indictment

6  returned by a grand jury rather than in an information like

7  this one that is issued by the United States Attorney's Office?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  Do you understand that a grand jury is

10 made up of 16 to 23 people and at least 12 them would have to

11 find probable cause to believe that you committed a crime to

12 charge you with that crime in an indictment?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  Do you understand that if this matter was

15 presented to a grand jury, it might or might not return an

16 indictment on either or both charges?

17         THE DEFENDANT:  Yes, Your Honor.

18         THE COURT:  Do you understand however that, if I

19 accept your waiver of indictment, you'll be giving up your

20 right to be charged by a grand jury and this case will proceed

21 just as if you had been indicted on the information that's

22 issued by the U.S. Attorney's Office?

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  Do you have there a copy of --

25         MR. THOMAS:  We do, Your Honor.  I'm sorry.

```
1              THE COURT:  -- two letters, each dated March 4, 2019,
2     to Mr. Thomas from the U.S. Attorney's Office?
3              (Defendant conferring with counsel.)
4              MR. DUFFY:  We have them with us.
5              THE COURT:  You have them?
6              THE DEFENDANT:  Yes, Your Honor.
7              THE COURT:  Well, one of them starts, the first
8     paragraph is change of plea.  We'll make a copy of that Exhibit
9     1 of today's date.  And the second March 4, 2019 letter says
10    "Cooperation Agreement."  We'll make that Exhibit 2.
11             Did you sign each of those letters on the last page?
12             THE DEFENDANT:  Yes, Your Honor.
13             THE COURT:  Did you read them before you signed them?
14             THE DEFENDANT:  Yes, Your Honor.
15             THE COURT:  Did you discuss them with Mr. Thomas
16    before you signed them?
17             THE DEFENDANT:  Yes, Your Honor.
18             THE COURT:  Do those two letters together accurately
19    and completely describe your agreement with the government?
20             THE DEFENDANT:  Yes, Your Honor.
21             THE COURT:  Has anybody made any promises to you or
22    given you any assurances that are not in those two letters?
23             THE DEFENDANT:  No, Your Honor.
24             THE COURT:  Has anybody threatened you or tried to
25    force you to waive indictment and plead guilty?
```

```
 1              THE DEFENDANT:  No, Your Honor.

 2              THE COURT:  And is that what you would like to do?

 3              THE DEFENDANT:  Yes, Your Honor.

 4              THE COURT:  Well, I will accept your waiver of

 5     indictment because I find you are competent, you are acting

 6     knowingly and voluntarily, you are effectively represented and

 7     therefore the waiver is appropriate.

 8              Does somebody have a waiver form?

 9              MR. THOMAS:  I have -- shall we sign it?

10              THE COURT:  Yes.  If the defendant will sign it, I

11     will sign it, too.

12              MR. THOMAS:  Your Honor, he was given two copies.  One

13     will suffice, though, I hope?

14              THE COURT:  One will suffice.

15              MR. THOMAS:  Mr. Meredith and I have both signed it,

16     Your Honor.

17              THE COURT:  And I've signed it, too.  We'll move to

18     the arraignment phase of these proceedings.

19              Would you like us to read the information to you, or

20     will you waive, give up, the reading of the information?

21              THE DEFENDANT:  We have the information.  You don't

22     need to read it, Your Honor.

23              THE COURT:  All right.  And how do you wish to plead

24     to the two counts again you, guilty or not guilty?

25              THE DEFENDANT:  Guilty, Your Honor.
```

1     THE COURT:  Then I'm going to ask you some additional

2     questions to determine whether I should accept your guilty

3     plea.  You told me that you read the information and discussed

4     it with Mr. Thomas; is that right?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  Are you fully satisfied with his work as

7     your lawyer?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  And did you discuss with Mr. Thomas the

10    issue that I -- one of the issues I was discussing earlier with

11    the attorneys; the fact that, unless you waive it, give it up,

12    you may have a right to have the conspiracy count, that's Count

13    One, proceed someplace other than Massachusetts, in Connecticut

14    possibly or possibly someplace else in the United States but

15    not in Massachusetts.  Do you understand that?

16         THE DEFENDANT:  Yes, I do, Your Honor.

17         THE COURT:  And did you discuss that with Mr. Thomas?

18         THE DEFENDANT:  Yes, we did, Your Honor.

19         THE COURT:  And do you want to give up your right to

20    object to this case proceeding in the District of

21    Massachusetts?

22         THE DEFENDANT:  Yeah -- yeah, I'm wavering.  Yes.

23    Sorry.

24         THE COURT:  Well, there's a difference between

25    wavering and waiving.

1      THE DEFENDANT:  Sorry, Your Honor.

2      THE COURT:  That's okay.  Do you understand that you

3  may have a right to have this case proceed someplace other than

4  the District of Massachusetts?

5      THE DEFENDANT:  Yes, I understand that, Your Honor.

6      THE COURT:  And do you want to give up that right?

7      THE DEFENDANT:  Yes, I'm giving up that right.

8      THE COURT:  And is that something you discussed with

9  Mr. Thomas?

10      THE DEFENDANT:  Yes, we have, Your Honor.

11      THE COURT:  Do you understand that if this case was

12  going to be contested by you, you might have -- well, you could

13  argue that you were entrapped, that the government improperly

14  lured you to Massachusetts and caused you to commit a federal

15  crime in Massachusetts that you wouldn't have committed in

16  Massachusetts or anyplace else.  Do you know that that's

17  something that might be argued?

18      THE DEFENDANT:  I understand, Your Honor.  Nobody

19  forced me to come to Massachusetts.

20      THE COURT:  But have you discussed with -- this is a

21  little different.  Have you discussed with Mr. Thomas whether

22  you want to give up the right to make that argument, which

23  might or might not be successful, and go ahead and plead guilty

24  anyway?

25      THE DEFENDANT:  Yeah, I'm pleading guilty.  I'll give

1    up that right, Your Honor.

2              THE COURT:  And did you discuss that with Mr. Thomas?

3              THE DEFENDANT:  Yes, I have, Your Honor.

4              THE COURT:  And you understand that the government has

5    said today that there are three errors in the information

6    against you and that the charges regarding Yale applicant 2

7    that are in Count Two, despite what it says in the information,

8    should not be considered as part of the conspiracy charged in

9    Count One.  Do you understand that?

10             THE DEFENDANT:  Yes, Your Honor.

11             THE COURT:  And do you understand that you're giving

12   up, if you plead guilty, your right to object to or seek any

13   legal relief based on those errors or any comparable errors?

14             THE DEFENDANT:  Yes, Your Honor, I understand.

15             THE COURT:  And did you discuss that with Mr. Thomas,

16   too?

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  All right.  Now, in the plea agreement --

19   when I refer to the "plea agreement," I'm talking about

20   Exhibits 1 and 2 -- you give up in addition certain rights to

21   appeal.  In Exhibit 1, in paragraph 6, by pleading guilty,

22   you're agreeing not to appeal or otherwise challenge the fact

23   that you're guilty and also any sentence of 41 months in prison

24   or less.  Do you understand that?

25             THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  And then in Exhibit 2, the cooperation

2     agreement, in paragraph 4, you're giving up your right to

3     appeal or otherwise challenge any sentence I give you if the

4     government files a motion telling me that you substantially

5     assisted in the investigation and prosecution of one or more

6     other people, and if I downwardly depart, give you a lower

7     sentence, because of that substantial assistance.  Do you

8     understand that?

9          THE DEFENDANT:  Yes, yes, Your Honor.

10          THE COURT:  And did you discuss those two waivers of

11    rights to challenge or appeal with Mr. Thomas specifically?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  And do you want to give up those rights?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  Do you understand if I accept your guilty

16    pleas, you'll become a federal felon, and you may lose certain

17    rights if you have, including the right to vote, to hold public

18    office, to serve on a jury and to possess a firearm?

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  And do you understand if it turned out you

21    were not an American citizen, you might very well be deported

22    from the United States and not allowed to return without the

23    permission of the Secretary of Homeland Security?

24          THE DEFENDANT:  I understand that, Your Honor.

25          THE COURT:  And do you understand that the maximum

1    possible penalties for Counts One and Two of the information

2    are, with regard to each count, incarceration for up to 20

3    years, supervised release for up to three years, a fine of

4    $250,000 or twice the gross gain or loss, whichever is greater,

5    a mandatory special assessment of $100, restitution and

6    forfeiture to the extent charged in the information?

7              THE DEFENDANT:  Yes, I understand, Your Honor.

8              THE COURT:  Mr. Rosen, what is the maximum possible

9    restitution, if any?

10             MR. ROSEN:  That's a difficult question.

11             THE COURT:  Well, I have to give him a maximum number.

12   Otherwise, when we come to sentencing, I can't order

13   restitution in excess of that amount.

14             MR. ROSEN:  Right.

15             THE COURT:  It's axiomatic.

16             MR. ROSEN:  Correct.  I'm going to cap it now at the

17   amount of the actual material gain to the defendant, which was

18   the 866,000.

19             THE COURT:  Do you understand that as part of the

20   sentence, you might be ordered to make restitution of $866,000?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  Do you understand that's in addition to

23   any fine that might be imposed?

24             THE DEFENDANT:  Yes, Your Honor.

25             THE COURT:  Do you understand that if you're sentenced

to prison, when you get out, you'll be under the supervision of the Probation Department on certain conditions; and if you violate any of those conditions, you can be locked up again for up to the full term of the supervised release?

THE DEFENDANT:  I understand, Your Honor.

THE COURT:  And do you understand that -- what's the amount of the forfeiture, please?

MR. ROSEN:  The total amount, Your Honor, is $866,000. It's divided up into sort of two tranches based on the amount that he's already paid, which is the $308,225.61, which he already paid in May of 2018, and the money judgment of the $557,000.

THE COURT:  Okay.  And do you understand you may also be ordered to forfeit $866,000 as part of your sentence?

MR. THOMAS:  Yes, with the understanding that a significant portion of that has already been delivered but not formally forfeited.

THE COURT:  Yes.

THE DEFENDANT:  Yes.  Yes, I understand.

THE COURT:  Do you understand that the sentencing in your case will be governed by the advisory guideline system that operates in Federal Court?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And have you talked with Mr. Thomas about how that guideline system might apply in your case?

1    THE DEFENDANT:  Yes, Your Honor.

2    THE COURT:  Do you understand, however, that as we sit

3    here today, neither Mr. Thomas nor anybody else can tell you

4    with certainty what the guideline range is for your sentence or

5    what sentence I will impose because until I conduct a

6    sentencing hearing, I cannot make those decisions myself?

7    THE DEFENDANT:  Yes, I understand, Your Honor.

8    THE COURT:  And as part of that, it relates to what I

9    was discussing with the lawyers earlier.  If it turns out that

10   there is evidence that it's legally permissible to consider

11   that indicates that you received other bribes as part of the

12   same common scheme or plan and it raises the total amount above

13   $1,500,000, the guideline range for your sentence could be

14   higher than calculated in the plea agreement?

15   THE DEFENDANT:  I understand that, Your Honor.

16   THE COURT:  And do you understand that if the

17   government files a motion that informs me you've substantially

18   assisted in the investigation or prosecution of others, I'll

19   have the authority to give you a sentence that's lower than the

20   guideline range?

21   THE DEFENDANT:  Yes, I understand, Your Honor.

22   THE COURT:  But that will be up to me -- do you

23   understand it will be up to the government whether to file the

24   motion and then up to me whether to grant it and downward

25   depart?

1          THE DEFENDANT:  Yes, I understand, Your Honor.

2          THE COURT:  And do you understand that depending on

3     the facts, I may have the authority to give a sentence that's

4     higher or lower than the guideline range, but in many cases,

5     absent a motion for a downward departure based on substantial

6     assistance, I find that it's most appropriate to give a

7     sentence within the guideline range?

8          THE DEFENDANT:  I understand, Your Honor.

9          THE COURT:  Do you understand that there's no parole

10    in the federal system?  So if I sentence you to prison, you

11    will be required to serve substantially all of that time in

12    prison?

13         THE DEFENDANT:  Yes, I understand, Your Honor.

14         THE COURT:  And do you understand if I give you a

15    sentence that's higher than you hoped for or even higher than

16    the government recommends, that won't be a reason permitting

17    you to withdraw your guilty plea?

18         THE DEFENDANT:  I understand, Your Honor.

19         THE COURT:  Do you understand you have a right, if you

20    want to use it, to have the charges against you decided at a

21    trial by a jury?

22         THE DEFENDANT:  I understand, Your Honor.

23         THE COURT:  And do you understand if we had a trial,

24    you would have a right to an attorney and, if you couldn't

25    afford an attorney, one would be appointed to represent you at

1  public expense?

2          THE DEFENDANT:  I understand, Your Honor.

3          THE COURT:  Do you understand that if we had a trial,

4  you would be presumed innocent?  You would not have to prove

5  you were innocent; rather, the government would have to prove

6  you were guilty beyond a reasonable doubt to achieve your

7  conviction on either charge?

8          THE DEFENDANT:  I understand, Your Honor.

9          THE COURT:  Do you understand if we had a trial, you'd

10 have an opportunity through your lawyer to object to the

11 government's evidence and challenge its witnesses?

12         THE DEFENDANT:  I understand, Your Honor.

13         THE COURT:  Do you understand if we had a trial, you

14 would also have an opportunity but not an obligation to present

15 a defense?

16         THE DEFENDANT:  I understand, Your Honor.

17         THE COURT:  Do you understand that as part of that

18 you'd have an opportunity but not an obligation to testify

19 yourself; and if you decided not to testify, then I would

20 instruct the jury that it could draw no suggestion that you

21 were guilty from your decision not to testify?

22         THE DEFENDANT:  Yes, I understand, Your Honor.

23         THE COURT:  And do you understand if I accept your

24 guilty plea, you'll be giving up your right to a trial and

25 there will be no trial?

1          THE DEFENDANT:  Yes, I understand, Your Honor.

2          THE COURT:  Okay.

3          Let me just -- all right.  Now I'm going to give you

4    instructions on the law that applies to Counts One and Two, and

5    then I'm going to ask you -- then I'm going to read the charges

6    to you and ask you whether you committed those crimes, having

7    in mind the legal standards that define them.

8          So do you understand that Count One charges you with

9    conspiring to commit wire fraud and honest services wire fraud?

10   Do you understand that?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  And do you understand that the government

13   would have to prove beyond a reasonable doubt conspiracy with

14   one of those two alleged objectives or goals but not both?

15         THE DEFENDANT:  Yes, Your Honor, I understand.

16         THE COURT:  And do you understand -- I thought Count

17   Two charges honest services wire fraud, but the government

18   wants it to be construed as wire fraud as well as honest

19   services wire fraud?

20         MR. ROSEN:  That's correct.

21         THE COURT:  And that's acceptable, Mr. Thomas?

22         MR. THOMAS:  Yes, it is.

23         THE COURT:  All right.  So do you understand there are

24   also two parts to Count Two, two ways you can be convicted?

25         THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  All right.  So do you understand that with
2    regard to honest services wire fraud, which is one of the two
3    objects of the alleged conspiracy in Count One and also one
4    form of the alleged crime in Count Two, the government would
5    have to prove a number of things beyond a reasonable doubt?  Do
6    you understand first the government would have to prove that
7    you were employed by Yale during the relevant period?
8          THE DEFENDANT:  Yes, I understand, Your Honor.
9          THE COURT:  And do you understand that the government
10   would have to prove that you had a fiduciary relationship with
11   Yale, meaning a trusting relationship in which one party, you,
12   acts for the benefit of another, Yale, and induces the other
13   party to relax the care or vigilance you would ordinarily
14   exercise in making certain decisions?
15         THE DEFENDANT:  Yes, I understand, Your Honor.
16         THE COURT:  And that language comes from Milovanovic,
17   678 F. 3d at 724, and as I noted, the Supreme Court has
18   indicated that an employee has a fiduciary duty to his
19   employer, that's Skilling in note 41.
20         Do you understand that the government would have to
21   prove, to prove conspiracy to commit honest services fraud or
22   honest services wire fraud, that you engaged in a scheme to
23   breach your fiduciary duty to give Yale honest advice regarding
24   an applicant for admission in return for a bribe?
25         THE DEFENDANT:  Yes, I understand, Your Honor.

1    THE COURT:  And do you understand a bribe is a payment

2    to the defendant, you, in exchange for one or more acts that

3    you performed as an employee of Yale?

4        THE DEFENDANT:  Yes, I understand, Your Honor.

5        THE COURT:  And that's derived from Sun-Diamond at

6    404-5.  And do you understand the government would have to

7    prove beyond a reasonable doubt that the payment was made with

8    the intent to influence you in an action you took as an

9    employee of Yale and received by you with intent to be

10   influenced in one of those official acts?

11       THE DEFENDANT:  Yes, Your Honor.

12       THE COURT:  Do you understand the government would

13   also have to prove that on or about the date alleged in the

14   particular count you participated -- one participant in the

15   scheme, you or somebody else involved in the conspiracy of the

16   scheme, transmitted or caused to be transmitted a wire

17   communication, which includes a wire transfer of money from one

18   state to another state, and you knew that that was occurring or

19   you should have foreseen that it would occur?

20       THE DEFENDANT:  Yes, Your Honor.

21       THE COURT:  All right.  And then in both counts --

22   Count One you're charged also with conspiracy to commit wire

23   fraud, and in Count Two, in addition to honest services wire

24   fraud, you're charged with wire fraud.  Do you understand that?

25       THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  So do you understand that to prove wire
2     fraud, particularly as alleged in Count Two but also relevant
3     to Count One, the government would have to prove beyond a
4     reasonable doubt first the existence of a scheme to defraud or
5     a scheme to get property from Yale by knowingly and willfully
6     making material false or misleading statements to Yale as
7     alleged in the information?
8          THE DEFENDANT:  Yes, I understand, Your Honor.
9          THE COURT:  And do you understand that defraud means,
10    among other things, in the context of this case, to deceive
11    Yale and deprive of it of your honest services in exchange for
12    a bribe?
13         THE DEFENDANT:  Yes, I understand, Your Honor.
14         THE COURT:  And do you understand a false statement is
15    a statement that you know at the time to be untrue or
16    misleading?
17         THE DEFENDANT:  Yes, Your Honor.
18         THE COURT:  And do you understand that the government
19    would have to prove, as I just suggested, that you made the
20    false or misleading statement knowingly, that is intentionally,
21    not by accident or mistake?
22         THE DEFENDANT:  Yes, I understand, Your Honor.
23         THE COURT:  And do you understand the government would
24    have to prove that you made that statement willfully, knowing
25    it was part of an illegal scheme?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  And do you understand the way this case is

3   charged, the government would have to prove that you made it

4   with intent to defraud, that is, to deceive Yale, to obtain

5   property for yourself or for another person, basically

6   admission to Yale?

7          THE DEFENDANT:  Yes, Your Honor, I understand.

8          THE COURT:  And do you understand that the right to

9   make a properly informed decision and control who gets admitted

10  to Yale is a form of Yale's property?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  Do you understand the government would

13  also have to prove beyond a reasonable doubt that any false or

14  misleading statement you made was material, meaning that it was

15  capable of influencing the decision of the decisionmaker to

16  whom it was addressed?

17         THE DEFENDANT:  Yes, Your Honor.

18         THE COURT:  And do you understand that the government

19  would have to prove beyond a reasonable doubt that for the

20  purpose of executing the scheme on or about the date alleged

21  you caused a wire communication from one state to another to

22  occur in furtherance of the scheme, or it was reasonably

23  foreseeable that an interstate wire communication would be used

24  in furtherance of the scheme?

25         THE DEFENDANT:  Yes, I understand, Your Honor.

1      THE COURT:  And with regard to the conspiracy -- so
2 Count One charges you with conspiracy to commit wire fraud and
3 honest services wire fraud.  Do you understand that to prove a
4 conspiracy, the government would have to prove beyond a
5 reasonable doubt first that the agreement specified in the
6 information and not some other agreement or agreements had
7 existed between you and Mr. Singer to commit the crimes of wire
8 fraud or honest services wire fraud?
9      THE DEFENDANT:  Yes, I understand, Your Honor.
10      THE COURT:  Do you understand that a conspiracy is a
11 spoken or unspoken agreement by two or more people to commit a
12 crime and it's the agreement that constitutes the crime; it
13 doesn't matter whether it achieved its unlawful goal?
14      THE DEFENDANT:  Yes, I understand, Your Honor.
15      THE COURT:  And do you understand that to achieve your
16 conviction on Count One, the government would have to prove
17 beyond a reasonable doubt that you were a member of the
18 conspiracy, meaning that you knowingly and willfully joined in
19 the agreement with at least one other person to commit at least
20 one of the crimes alleged to be an object of the conspiracy?
21      THE DEFENDANT:  Yes, I understand, Your Honor.
22      THE COURT:  And again, do you understand that to act
23 knowingly means to act voluntarily and intentionally, not by
24 accident or mistake?
25      THE DEFENDANT:  Yes, I understand, Your Honor.

1          THE COURT:  And do you understand to act willfully

2    means essentially to act knowing that what you were doing was

3    illegal?

4          THE DEFENDANT:  Yes, I understand, Your Honor.

5          THE COURT:  And do you understand that to prove your

6    membership of the conspiracy, the government would have to

7    prove beyond a reasonable doubt that you joined the conspiracy

8    willfully and that you both intended to agree with one other

9    alleged conspirator to commit at least one of the crimes, wire

10   fraud or honest services wire fraud, and also intended that the

11   crime actually be committed?

12         THE DEFENDANT:  Yes, I understand, Your Honor.

13         THE COURT:  And do you understand that with regard to

14   Count One, the government would have to prove that you entered

15   into an agreement to exchange an act as an employee of Yale, in

16   this case recommending somebody for admission as a soccer

17   player, in return for payment that was made and accepted to get

18   you to make that official act?

19         THE DEFENDANT:  Yes, I understand, Your Honor.

20         THE COURT:  And do you understand that the government

21   would have to prove that there was an overt act that occurred

22   in furtherance of the conspiracy, that some -- I'll explain it

23   to you.  But do you understand that generally?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  And do you understand that an overt act is

an act knowingly committed by one or more of the conspirators
during the period of the conspiracy in an effort to accomplish
a goal of the conspiracy?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do counsel think I've covered everything I
should cover?

MR. ROSEN:  Yes, Your Honor.

MR. THOMAS:  I agree.

THE COURT:  So let's look at the information.  You
said you read the information; is that correct?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And Count One, which is on page 6 in
paragraph 24, charged that from in or about April 2014 through
in or about April 2018 in the District of Connecticut and
elsewhere, the defendant, Rudolph "Rudy" Meredith, conspired
with William "Rick" Singer and others known and unknown to the
United States Attorney to commit wire fraud and honest services
wire fraud, that is, having devised and intending to devise a
scheme and artifice to defraud -- and "and" in an indictment
and means "or," so or to obtain money or property, specifically
admission to Yale University, by means of materially false and
fraudulent pretenses, representations and promises and -- which
here means "or" -- to deprive his employer, Yale University, of
its right to his honest and faithful services through bribes
and kickbacks did transmit and cause to be transmitted, by

means of wire communication in interstate or foreign commerce,
writings, signs, signals and sounds for the purpose of
executing the scheme to defraud.

Did you commit the crime charged in Count One?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And Count Two charges that -- this is in
paragraph 26 -- on or about April 18, 2018, in the District of
Massachusetts and elsewhere, the defendant, you, having devised
and intending to devise a scheme and artifice to defraud or for
obtaining money and property, specifically admission to Yale,
by means of materially false and fraudulent pretenses or
representations and promises or -- it "says "and" but "or" --
or to deprive his employer, Yale University, of its right to
his honest and faithful services through bribes and kickbacks
did, for the purpose of executing a scheme to defraud, transmit
and cause to be transmitted by means of wire communications in
interstate and foreign commerce, writings, signs, signals,
pictures and sounds, specifically a $4,000 wire transfer from a
bank account in Massachusetts to a bank account in Connecticut.

Did you commit that crime?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Now, did you read the
submission the government made in response to my order that was
filed on March 15, it's docket number 18, and it includes a
statement of facts relating to what you allegedly did that

1   begins on page 8?

2          MR. THOMAS:  I don't know that he did, Your Honor, but

3   let me show him the document --

4          THE COURT:  It may not be -- you can refresh his

5   recollection.  The government is going to have a chance to

6   speak to it.

7          MR. THOMAS:  I don't think we did that.  I think that

8   was done by the lawyers.

9          THE COURT:  Here, I'm going to ask the prosecutor to

10  summarize what the government's evidence would have been if we

11  went to trial, and then I'm going to ask if you agree with his

12  summary of what you did.

13         MR. ROSEN:  Judge, the government would show that the

14  defendant was obviously an employee and a fiduciary of Yale.

15  The government would also show that the admissions spot at Yale

16  was a property right of Yale.  And the government would also

17  show that Yale has athletic spots that they allocate to coaches

18  for the purpose of recruiting student athletes and providing

19  sort of increased chances of admission for the student

20  athletes, which is obviously a valuable commodity to be had for

21  a school such as Yale, which has a 6 percent admissions rate

22  and extremely high grade point average and SAT score for

23  incoming students.  The evidence would also show that between

24  April of 2015 and April of 2018 the defendant agreed to accept

25  bribe payments from Rick Singer, who operates the Key and the

Key Worldwide Foundation.   In total $860,000 was paid.   This
was for multiple students.

          The agreement focused on -- the information focuses on
one in particular, a student who reached out to Singer in
November of 2017.   Singer then created a fake soccer profile.
The student did not play soccer or at least did not play soccer
competitively at any level.   The profile falsely depicted her
as a co-captain of a prominent soccer club team and a member of
I believe a Chinese national team -- is that correct -- and
provided this profile to defendant, who knew that the woman was
not a competitive soccer player.

          The defendant then used it to justify the recruitment
of the student.   The student was allowed to apply early to
Yale.   She had already passed the deadline for early
application.   The defendant facilitated the admission of the
application after the deadline.   She was admitted early.   And
in return for that, the defendant received $400,000.   It was a
check in the mail.

          Singer in turn was paid $1.2 million by the family of
the Yale applicant.   This came both into Singer's charity
account, about $900,000, and as well into his sort of business
bank account.

          Defendant also solicited bribes from a Los Angeles
individual.   They had met in I believe the early summer of
2017.   Meredith asked defendant -- sorry.   Defendant asked the

1  father of the Yale applicant for bribe payments and an

2  agreement was struck.  The individual, the person began paying

3  Mr. Meredith on a monthly basis, and that continued through

4  March of 2018 in which these payments continued.  The defendant

5  and the individual from Los Angeles met in Boston on April 12

6  of 2018.  Meredith was provided with a sum of money as part,

7  again, partial payment for the bribe.  During this meeting,

8  they arrived at a figure of $450,000 for the bribe, and then

9  finally on April 18, 2018, the wire transfer of $4,000 as

10  payment for the scheme from Massachusetts to defendant's bank

11  account in Connecticut.

12          THE COURT:  Do you agree with the government's summary

13  of what you did?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  And how do you now wish to plead to the

16  two charges against you, guilty or not guilty?

17          THE DEFENDANT:  Guilty, Your Honor.

18          THE COURT:  Then I will direct the clerk to enter your

19  pleas of guilty because I find you are competent, you are

20  acting knowingly and voluntarily, you are effectively

21  represented, there's as independent basis in fact to support

22  your guilty plea.  And based on the representations of the

23  government, I find that accepting the guilty plea, even though

24  there may be potential charges that weren't pursued, adequately

25  reflects the seriousness of the actual offense behavior --

1  well, here I'm just accepting the plea, not the agreement, but

2  not undermine the statutory purposes of sentencing or the

3  guidelines. I'll consider that issue further at the

4  sentencing. The parties should address it in their sentencing

5  memos. But you may take your seat back at the table.

6         THE DEFENDANT: Thank you, Your Honor.

7         THE COURT: Ordinarily, I would, and maybe I will,

8  schedule the sentencing for late -- something like June 20.

9  And if there's a reason to postpone the sentencing, if there's

10  a motion, I'll consider it. But does anybody want to be heard

11  on the sentencing being scheduled for, say, 2:30 on June 20?

12         MR. ROSEN: That's fine. I think the government would

13  anticipate filing a motion closer to the date, Your Honor.

14         THE COURT: Okay.

15         MR. THOMAS: I will note, I think it was in the plea

16  agreement, we included a clause where we agreed in advance to

17  potential continuances, it probably was the cooperation

18  agreement, in furtherance of the objectives of that agreement.

19         THE COURT: Well, I have that in mind, but not knowing

20  where this is going to go, I'm scheduling the sentencing for

21  June 20, at 2:30 p.m.

22         If the parties expect to -- well, if the parties want

23  to move for a continuance based on continued cooperation, I

24  assume, that's not complete, any motion to that effect shall be

25  filed by May 29. If there is no such motion and no such motion

is granted, anything not in the Presentence Report, memos,

motions, letters, shall be filed by June 6 and any responses by

June 13.

If there's anything that any party wants to file under

seal, you would have to file a motion to seal as required by

Local Rule 7.2, with a redacted copy of the document for the

public record or some compelling explanation as to why even a

redacted copy can't be made part of the public record.

Is there anything further in this matter for today?

MR. ROSEN:  No, Your Honor.

MR. THOMAS:  No, Your Honor.

THE COURT:  Court is in recess.

(Recess taken 3:41 p.m.)

THE COURT:  Actually, sorry.  There's one thing I

meant to mention.  As I wrote in DeJong, I'm ordering the

government particularly to provide the probation department and

me with all of the information that might be relevant to

sentencing, particularly to calculating the guideline range.

And if there's a concern that some of it cannot properly be

used because it was obtained pursuant to the proffer agreement,

it's immunized, point that out.  If you think that order is not

a legally permissible or appropriate order, you can move for

reconsideration of it.  You didn't have notice of this in this

case.  But basically, the Supreme Court in Gall and

subsequently says all sentencings have to start by properly

1    calculating the guideline range, and if there's relevant

2    conduct about which the government has information, I need to

3    know it.  Okay?

4              MR. ROSEN:  Thank you.

5              THE COURT:  Court is in recess.

6              (Recess taken 3:43 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   CERTIFICATE OF OFFICIAL REPORTER

 2

 3              I, Kelly Mortellite, Registered Merit Reporter

 4     and Certified Realtime Reporter, in and for the United States

 5     District Court for the District of Massachusetts, do hereby

 6     certify that the foregoing transcript is a true and correct

 7     transcript of the stenographically reported proceedings held in

 8     the above-entitled matter to the best of my skill and ability.

 9                   Dated this 31st day of March, 2019.

10

11                   /s/ Kelly Mortellite

12                   _____

13                   Kelly Mortellite, RMR, CRR

14                   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```